| | | |
|---|---|---|
| IBIKUNLE OJEBUOBOH, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| KATHLEEN SEBELIUS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for summary judgment.

## I. BACKGROUND

This case arises out of claims for Medicare reimbursement that plaintiff, an internal medicine physician in Jacksonville, North Carolina, submitted. Before discussing the factual background of this case, a brief discussion of the statutory background is warranted. "The Medicare Act (the Medicare Act), 42 U.S.C. § 1395 *et seq.*, establishes a federally subsidized health insurance program for eligible aged and disabled persons." MacKenzie Med. Supply, Inc. v. Leavitt, 506 F.3d 341, 343 (4th Cir. 2007). "The Medicare program is administered by the Center[s] for Medicare & Medicaid Services (CMS), a division of the United States Department of Health and Human Services (HHS) supervised by the Secretary." Id. (citation omitted).

The Medicare Act has four parts, only one of which, Part B, is relevant here. Part B provides supplemental voluntary medical insurance for physician services, among other things. Rehab. Ass'n of Va., Inc. v. Kozlowski, 42 F.3d 1444, 1446 (4th Cir. 1994), cert. denied, 516 U.S. 811 (1995). "In all cases, Medicare Part B coverage is limited to services that are medically

'reasonable and necessary' for the diagnosis or treatment of illness." <u>MacKenzie Med. Supply</u>, 506 F.3d at 344 (quoting 42 U.S.C. § 1395y(a)(1)(A)). "Although 'reasonable and necessary' is not defined in the Act, Congress has vested final authority in the Secretary to determine what items or services are 'reasonable and necessary.'" <u>Garcia v. Sebelius</u>, No. CV 10-8820 PA, 2011 WL 5434426, at *1 (C.D. Cal. Nov. 8, 2011) (citations omitted).

In submitting a claim for payment, a provider, such as a physician, is obligated to furnish sufficient information to enable HHS to determine whether payment is due and its amount. 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6). The Secretary and Medicare contractors are authorized to conduct post-payment audits of a provider of services in order to recover any overpayments. 42 U.S.C. § 1395ddd(f). The Medicare Act has an extensive appeals process by which a provider can challenge an overpayment determination. That process is discussed as follows with specific reference to the facts of this case.

In March 2006, AdvanceMed Corporation ("AdvanceMed"), a CMS program safeguard contractor,[1] conducted an audit of the Medicare claims plaintiff had submitted (and for which he had received reimbursement) for services provided between 1 January 2004 and 30 September 2005. (Pl.'s Stmt. Facts, DE # 18, ¶ 2; AR at 001476-98.[2]) AdvanceMed denied or "downcoded"[3] claims for a total of 100 services. (Pl.'s Stmt. Facts, DE # 18, ¶ 2.) Plaintiff

---

[1]CMS contracts with program safeguard contractors "to ensure that items or services are covered and are reasonable and necessary in accordance with Medicare coverage policies and program instructions." 42 C.F.R. § 421.500.

[2]The Administrative Record is referred to as "AR," with page citation to the bates number in the lower right corner. It was filed in CD-ROM format. (<u>See</u> DE # 14.)

[3]In this case, "downcoding" is the process whereby the claim reviewer lowers the Current Procedural Terminology ("CPT") code used by the physician to describe the kind and level of service provided, resulting in the claim being allowed but at a lower rate of reimbursement.

2

thereafter paid the government approximately $179,000, representing an overpayment amount

calculated using statistical sampling extrapolation.  (Id.)  On plaintiff's request for a

redetermination, CIGNA Government Services ("CIGNA"), a Medicare contractor, determined

that the assessed overpayment was fully valid.  (AR at 01456-61.)  See also 42 U.S.C. §

1395ff(a)(3) (authorizing the Secretary to promulgate regulations for redeterminations); 42

C.F.R. § 405.940 ("A person or entity that may be a party to a redetermination . . . and that is

dissatisfied with an initial determination may request a redetermination by a contractor . . . .").

Plaintiff then requested reconsideration of that decision.  See 42 U.S.C. § 1395ff(b)(1)(A)

("[A]ny individual dissatisfied with any initial determination . . . shall be entitled to

reconsideration of the determination . . . ."); 42 C.F.R. § 405.960 ("A person or entity that is a

party to a redetermination made by a contractor . . . and is dissatisfied with that determination,

may request a reconsideration by a QIC [(qualified independent contractor)] . . . .").  Q²

Administrators, LLC ("Q²") performed the reconsideration, which resulted in a partially

favorable decision for plaintiff.  (AR at 01358-97.)  Upon recalculation, it was determined that

plaintiff had been overpaid approximately $80,000; plaintiff was therefore refunded

approximately $99,000 (representing the approximate difference between the amount he had

initially paid the government, $179,000, and the recalculated overpayment amount, $80,000).

(AR at 01353-54.)

Plaintiff next requested a *de novo* hearing before an Administrative Law Judge ("ALJ").

See 42 U.S.C. § 1395ff(b)(1)(A), (d)(1) (providing for right to a hearing before an ALJ); 42

C.F.R. § 405.1000(a) (a party dissatisfied with a reconsideration may request a hearing before an

ALJ), (d) (ALJ conducts a *de novo* review).  Plaintiff disputed Q²'s determination as to 76

3

services.  (See AR at 01281-83.)  The ALJ conducted the hearing in December 2008 and issued a

decision as to each of the beneficiaries (i.e., patients) of the disputed services in April 2009.

(AR at 00789-1105.)  In sum, the ALJ partially ruled in plaintiff's favor.  According to plaintiff,

as a result of the ALJ's decisions, he was refunded approximately $43,000.  (Pl.'s Stmt. Facts,

DE # 18, ¶ 7.)

Thereafter, plaintiff requested *de novo* review by the Medicare Appeals Council

("MAC").  (AR at 00152-787.)  See also 42 U.S.C. § 1395ff(d)(2)(B) (providing for

Departmental Appeals Board[4] *de novo* review of the ALJ decision); 42 C.F.R. § 405.1100(a)

("The appellant or any other party to the hearing may request that the MAC review an ALJ's

decision or dismissal."), (c) ("When the MAC reviews an ALJ's decision, it undertakes a *de*

*novo* review.").  At issue were the ALJ's findings as to 27 services related to 18 beneficiaries.

(AR at 00134.)  The MAC reversed a finding of non-coverage as to one service; reversed

findings of coverage as to six services; modified the findings as to seven services (which resulted

in the downcoding of those services); and affirmed the findings of non-coverage as to 13

services.  (AR at 00135-38.)  Plaintiff paid the recalculated overpayment amount of

approximately $12,000.  (Pl.'s Stmt. Facts, DE # 18, ¶ 10 & Ex. 5, DE # 18-5.)  Plaintiff filed a

motion for reconsideration of the MAC decision, which the MAC denied on 2 December 2010.

(AR at 00001-5.)  The MAC's decision constitutes the Secretary's final decision.  See 42 U.S.C.

§ 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.

Pursuant to 42 U.S.C. § 1395ff(b)(1)(A), on 4 February 2011, plaintiff filed the instant

case for judicial review of the Secretary's final decision and requests that the court reverse the

---

[4]The MAC is a part of the Departmental Appeals Board.  Almy v. Sebelius, ___ F.3d ___, 2012 WL
1446029, at *2 (4th Cir. 2012).

Secretary's decision as to claims for 26 services, which were deemed non-covered or downcoded. (Compl., DE # 2, ¶¶ 7, 11.)

## II.  STANDARD OF REVIEW

This court's review of the Secretary's decision is limited to the administrative record, and the Secretary's findings of fact are conclusive if supported by substantial evidence. MacKenzie Med. Supply, 506 F.3d at 346. Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Almy, 2012 WL 1446029, at *3 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

As the Court of Appeals for the Fourth Circuit has recently explained:

> Our review is [] necessarily a limited one.  "[W]e do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary.  Where conflicting evidence allows reasonable minds to differ . . . , the responsibility for that decision falls on the Secretary."
> Quite apart from matters of fact, the Secretary's decisions are governed by the Administrative Procedure Act (APA), which requires courts to determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law, . . . [or] without observance of procedure required by law."  Our court has been clear that "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid."  In practice, an action will not be considered arbitrary and capricious so long as "the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'"

Id. at *3-4 (citations omitted) (most alterations in original).

## III.  ANALYSIS

The 26 services at issue here are evaluation and management ("E/M") services.  An E/M

service is a physician-patient encounter.  (Pl.'s Mem., DE # 19, at 2; Def.'s Mem., DE # 24, at 1.)  In submitting a claim to Medicare for payment for an E/M service, the physician must identify the service by the appropriate five-digit CPT code.  (Pl.'s Mem., DE # 19, at 2; Def.'s Mem., DE # 24, at 5-6.)  See generally Medicare Claims Processing Manual, ch. 12, § 30.6, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.  "The physician's documentation of each physician-patient encounter should reflect three 'key' components– a history, a physical exam, and medical decision making."  (Pl.'s Mem., DE # 19, at 2.)  Each of these components is broken down into levels.  See Evaluation and Management Services Guide at 8 (2010), http://cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/EMDOC.html.  "In general, the more complex the visit, the higher the level of code the physician . . .  may bill within the appropriate category."  Id.  A history may be problem focused, expanded problem focused, detailed, or comprehensive.  Id.  A physical examination is classified by the same levels as a history.  Id. at 14.  Medical decision making is straightforward, low complexity, moderate complexity, or high complexity.  Id. at 16.  Each of the components at the varying levels has specific elements which must be documented.  See id. at 8-19; infra n.8.  "For example, a problem focused history requires the documentation of the chief complaint (CC) and a brief history of present illness (HPI) while a detailed history requires the documentation of a CC, an extended HPI, plus an extended review of systems (ROS), and pertinent past, family, and/or social history (PFSH)."  Evaluation and Management Services Guide at 8.

To assist a physician with correct coding of E/M services, CMS has published documentation guidelines.  There are two versions of the guidelines, the 1995 Documentation

Guidelines for Evaluation and Management Services ("1995 Guidelines") and the 1997

Documentation Guidelines for Evaluation and Management Services ("1997 Guidelines").

http://cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/

EMDOC.html. "Either version of the documentation guidelines, not a combination of the two,

may be used by the provider for a patient encounter." Evaluation and Management Services

Guide at 1, 13; see also Fact Sheet– Evaluation and Management (E/M) Services: Complying

with Documentation Requirements at 3 (2011), http://www.cms.gov/Outreach-and-Education/

Medicare-Learning-Network-MLN/MLNEdWebGuide/EMDOC.html. "The most substantial

differences between the two versions occur in the examination documentation section."

Evaluation and Management Services Guide at 13. "'Carriers and A/B Medicare Administration

Contractors [] are to continue reviews using both the 1995 and 1997 Documentation Guidelines

for Evaluation and Management Services (whichever is more advantageous to the physician).'"

(Pl.'s Mem., DE # 19, at 5 (quoting http://www.cms.gov/MLNEDWebGuide/25_EMDOC.asp);

see also id. ("'Medicare Contractors must conduct reviews using both the 1995 and the 1997

guidelines and apply the guidelines that are most advantageous to the provider.'" (quoting http://

www.cms.gov/MLNProducts/download/physicianguide.pdf).[5])

    In this case, the MAC found that the 1997 Guidelines are "[r]elevant to this case." (AR

at 00096.) The MAC stated, "Pertinent to this case are the guidelines for examinations

concerning the general multi-system examination." (Id.) The MAC proceeded to note the

---

[5]The court notes that the quoted statement no longer appears on the CMS website. Also, the Medicare
Physician Guide appears to have been updated and does not contain any substantive information about the
Guidelines. See Medicare Physician Guide at 73 (2011), https://www.cms.gov/MLNProducts/downloads/
MedicarePhysicianGuide_ICN005933.pdf. Even so, the government does not deny that, at least for the relevant time
here, Medicare contractors were required to conduct reviews in accordance with both versions of the Guidelines.

documentation requirements for each level of the physical examination component of an E/M service (e.g., problem focused, expanded problem focused). (Id.) The MAC then reviewed each service at issue by beneficiary. (Id. at 00097-130.) The MAC found against plaintiff as to the majority of the services based on plaintiff's failure to meet the physical examination documentation requirements of the 1997 Guidelines. (Id.)

## A. The MAC's Reliance on the 1997 Guidelines

Plaintiff first argues that the MAC erred by defining the physical examination component for each E/M service at issue by the 1997 Guidelines without considering the 1995 Guidelines. (Pl.'s Mem., DE # 19, at 6.) He contends that by doing so, the MAC violated CMS policy, for which the MAC offered no reason. (Id.) Plaintiff is correct that while the MAC is not bound by CMS policy, it must give substantial deference to such policies applicable to a particular case, and if the MAC declines to follow any such policy, it must explain its reasons for doing so. See 42 C.F.R. § 405.1062(a), (b). For purposes of plaintiff's argument, the court accepts that application of 1995 and 1997 Guidelines, as most advantageous to the physician, constitutes CMS policy.

In ruling on plaintiff's motion for reconsideration, the MAC explained the rationale for its reliance on the 1997 Guidelines. (AR at 00002-4.) In relevant part, the MAC stated:

> [B]y virtue of the Qualified Independent Contractor's (QIC's) reconsideration decision, you were on notice that the QIC applied the 1997 Documentation Guidelines in making its determination. Specifically, the QIC advised you that:
> > Generally speaking, the 1997 guidelines are more favorable to the provider than the 1995 guidelines.
> >    * * * * * *
> > . . . Evaluation of the musculoskeletal system includes, but is not limited to, assessments such as examination of gait and station, inspection and/or

8

palpitation of digits and nails, assessment of range
of motion, or inspection and/or palpitation with
notation of presence of any misalignment,
asymmetry, crepitation, defects, tenderness, masses
or effusions.  Constitutional evaluation must include
at least <u>three (3)</u> vital signs . . .   For example,
detailed assessment of the cardiovascular system
would included [sic] at least an auscultation of the
heart with notation of abnormal sounds and
murmurs and one other detail such as assessment of
extremity edema or pedal pulses.

The descriptive language used by the QIC in its example was taken
directly from the 1997 Guidelines. . . .

As you stated in the Motion for Reconsideration, the requirements
of the 1995 Documentation Guidelines are more favorable to the
provider, and easier to meet.  However, it is the contractor, and not
the provider, who determines which guidelines to apply during the
review process.  And, as you previously indicated, CMS has
instructed the contractors . . . to use both of the guidelines,
whichever is more favorable to the provider.  In the QIC's opinion,
the 1997 Guidelines are more favorable to the provider. . . .
Further, it wasn't until submission of the Motion for
Reconsideration that you specifically address the issue of the
applicability of the 1995 Documentation Guidelines over use of the
1997 Guidelines.  In your request for an ALJ hearing, you stated
that a rebuttal to the QIC's "new and different" reasons for
downcoding/denial of services would be offered at the hearing. . . .
Also, in the request for Council review, you only assert that the
MLN [i.e., CMS's Medicare Leaning Network] "instructs carriers
to conduct reviews using both the 1995 and 1997 Documentation
Guidelines for [E/M] services (whichever is more advantageous to
the physician).["]  Since you were on notice of the QIC's
application of the 1997 Guidelines, the issues to be addressed at
the hearing should have specifically included whether the QIC
properly applied the 1997 Guidelines instead of the 1995
Guidelines.

(<u>Id.</u> (footnote and citations omitted) (most alterations in original).)

In sum, the primary grounds for the MAC's use of the 1997 Guidelines are that the

qualified independent contractor, Q², used those guidelines (as more favorable to plaintiff) and

that plaintiff did not specifically address the issue of the applicability of the 1995 Guidelines

9

over the 1997 Guidelines until his motion for reconsideration.  In reaching this conclusion, the

MAC did not violate CMS policy.  The MAC simply adopted the decision of Q² to use the 1997

Guidelines.  A review of the history of how plaintiff presented the issues for review to the ALJ

and the MAC supports the MAC's conclusion.

In the materials plaintiff submitted to the ALJ prior to his review, plaintiff submitted a

memorandum which discussed, in part, the two version of the guidelines.  (AR at 02883-85.)

Plaintiff did note that the 1997 Guidelines "offer[] a[n] alternative way to document the exam

component of a service."  (Id. at 02883.)  However, the thrust of plaintiff's discussion about the

guidelines addressed the history component.  (See id. at 02883-85.)  Plaintiff pointed out that the

1997 Guidelines expanded "the definition of extended history of present illness (HPI) . . . to

include information about chronic or inactive conditions."  (AR at 02883.)  Plaintiff then

advocated for use of a combination of the guidelines:

> . . . .  Most physicians document exam and medical decision
> making components by reference to the 1995 [G]uidelines.  When
> several chronic conditions are being managed, Carriers generally
> allow the use of the extended definition HPI within the 1997
> Guidelines for the history component.  In short, a history (1997
> Guidelines) combined with exam and medical decision making
> (1995 Guidelines) is permitted.
> This interpretation represents the most advantageous way of using
> either the 1995 or 1997 Guidelines.  It is reasonable and is the
> interpretation adopted and followed by many Medicare Carriers.

(Id. at 02884.)  Plaintiff reiterated this position at the hearing before the ALJ.  (See AR at 02080

("When I talk about the three chronic systems or more, or three chronic conditions, rather, or

more, I'm really asking for the '97 history component to be combined with the '95 exam and

medical decision-making components.").  In his written decisions, the ALJ did not refer

whatsoever to the Guidelines.  (See id. at 00789-1105.)

10

With his request for review of the ALJ decisions to the MAC, plaintiff submitted

"general objections." He stated in relevant part:

> ### No Deference Given to CMS Guidance
> The ALJ cites 42 CFR 405.1062 which directs Administrative Law
> Judges to give substantial deference to CMS program guidance or
> explain why the guidance is not followed.
> The CMS Medicare Learning Network (MLN) web site instructs
> Medicare carriers to conduct reviews using both the 1995 and 1997
> Documentation Guidelines for Evaluation and Management
> Services (whichever is more advantageous to the physician). The
> level of an Evaluation and Management Service must be
> determined by applying the 1995 or 1997 Documentation
> Guidelines. See Appellant's Exhibit 1.
> However, none of the ALJ Decisions mentions the Documentation
> Guidelines. The ALJ does not demonstrate a competent effort to
> apply the Documentation Guidelines; nor does the ALJ offer a
> reason for not applying the Documentation Guidelines.
> ### A Specific Reason Must Be Given
> The ALJ Decisions do contain phrases lifted from portions of the
> Documentation Guidelines. Those phrases are turned into
> conclusions. The ALJ Decisions do not adequately explain the
> intervening steps that should have been followed to reach that
> conclusion; nor do the ALJ Decisions explain how the Appellant
> deviated from the Documentation Guidelines. In short, no specific
> reason is given for the denial or downcoding of an E/M service.
> See the relevant manual provisions on the following page.[6]

(AR at 00156.) In his separate discussion of each disputed service, plaintiff did cite to, as

relevant authority, CMS's website statement that carriers must conduct reviews according to

both versions of the Guidelines (whichever is more advantageous to the physician); the 1995

---

[6]The MAC characterized these objections as follows:
> 2. The ALJ failed to give substantial deference to CMS program guidance or, in
> the alternative, explain why the guidance is not followed. Specifically, the
> appellant refers to 1995 and 1997 Documentation Guidelines for Evaluation and
> Management Services which, according to the appellant, the ALJ fails to follow
> in making a determination as to the E/M services at issue.
> 3. The ALJ erred in not providing a specific reason for denial or downcoding of
> the E/M services at issue, in accordance with the Documentation Guidelines.

(AR at 00084.)

Guidelines; and a scoring sheet he completed according to the 1995 Guidelines, among other things. (See, e.g., id. at 00168-69.) However, in none of those materials submitted did plaintiff explicitly or directly make the argument to the MAC that the 1995 Guidelines should be applied instead of the 1997 Guidelines.[7] (See, e.g., id.) It was not until his motion for reconsideration that plaintiff contended that the 1995 Guidelines are more advantageous to him than the 1997 Guidelines. (See id. at 00044-45.) Accordingly, the court concludes that the MAC's adoption of Q²'s decision to use the 1997 Guidelines is not arbitrary, capricious, or an abuse of discretion.

**B.     The MAC's Analysis of the History and Medical Decision Making Components**

Plaintiff claims that the Secretary, through the MAC, acted arbitrarily and abused her discretion by failing to analyze the elements of the history and medical decision making components for an E/M service.[8] (Pl.'s Mem., DE # 19, at 7; see also Compl. ¶¶ 67-68.) Plaintiff contends that for "most" services, the MAC ignored the elements of the history component, and for a "few" services, it concluded the visit did not meet all the elements of a particular level of the history component (e.g., detailed), without any analysis or explanation. (Pl.'s Mem., DE # 19, at 7.) Plaintiff makes a similar contention with regard to the medical

---

[7]For example, with respect to beneficiary VA (date of service 19 June 2004), plaintiff raised three specific objections to the ALJ's decision: (1) the ALJ's decision on the medical decision making component; (2) the ALJ's failure to mention the Guidelines, "demonstrate a competent effort to apply the Documentation Guidelines," or "offer a reason for not applying the Documentation Guidelines[;]" and (3) the ALJ's failure to consider the criteria for each element of medical decision making as set forth in the Guidelines. (AR at 00170-72.) In summary, plaintiff's argument to the MAC was that the ALJ erred by failing to follow CMS guidance to apply the 1995 or 1997 Guidelines and by ignoring the criteria within the Guidelines for the elements of the medical decision making component. (Id. at 00173.)

[8]The elements of the history component are chief complaint, history of present illness, review of systems, and past, family, and/or social history. 1997 Guidelines at 5; 1995 Guidelines at 4. The elements of medical decision making are number of diagnoses or management options to be considered, amount and/or complexity of data to be reviewed, and risk of complications and/or morbidity or mortality. 1997 Guidelines at 43; 1995 Guidelines at 11.

decision making component for some services. (See id. at 8.) What plaintiff fails to do is identify the particular dates of service as to which the MAC supposedly committed this error; explain why the MAC was obligated to specifically identify each and every element of the history and medical decision making components and provide a written analysis of the same; or explain why a more detailed analysis would have altered the MAC's conclusions. As to each service at issue, the MAC recounted the CPT code at which plaintiff billed the service and the carrier's, QIC's, and ALJ's decisions; identified pertinent portions of the medical records; and explained (by reference to pertinent components and elements) its conclusion. While the MAC may not have thoroughly detailed every element of every component, it is nonetheless evident that the MAC sufficiently considered the record and adequately explained the basis for its coverage decision on each service. Therefore, the court concludes that the MAC did not act arbitrarily or abuse its discretion as plaintiff claims.

Aside from the grounds above, plaintiff contends that the Secretary reached the wrong decision as to services provided to two beneficiaries, WB and MT. (See Compl., DE # 2, ¶¶ 79-84, 86-92.) The court will consider each beneficiary in turn.

### C.     The MAC's Decision as to Beneficiary WB

Plaintiff rendered an E/M service to WB on 21 July 2004. (Id. ¶ 80; Pl.'s Stmt. Facts, DE # 18, ¶ 14; Pl.'s Mem., DE # 19, at 14; AR at 00239.) However, apparently due to a clerical error on the part of plaintiff's staff, the date for this service was submitted for purposes of the audit as being 22 July 2004. (Pl.'s Mem., DE # 19, at 15.) Upon its audit, AdvanceMed downcoded the service from the CPT code at which plaintiff billed the service, 99235, to 99232, and on redetermination, CIGNA refused to alter AdvanceMed's finding. (See AR at 01456,

13

01466, 01478.)  On reconsideration, Q² found that plaintiff was not entitled to any payment for the service because "[t]he documentation submitted did not support the level of service identified by CPT code 99235 or 99232."  (Id. at 01381, 01397.)  Similarly, the ALJ concluded that plaintiff's documentation did not support the CPT code at which he billed the service (i.e., 99235), and thus, Medicare did not cover the service.  (Id. at 01054-55.)  The MAC's decision as to the service in its entirety follows.

> The Council notes at the outset that the only services documented in the record for the above beneficiary pertain to July 20th and July 21st, 2004.  The appellant has not appealed these dates of service. Briefly, the record indicates that the beneficiary presented to the Onslow Memorial Hospital emergency room and was seen by the appellant for evaluation of a bleeding Port-A-Cath site.  At issue is the service dated July 22, 2004, which was billed under CPT code 99235.  Although there are documents in the record pertaining to the two preceding days of service, there are none for July 22, 2004. Accordingly there is no documentation that the appellant provided any services to the beneficiary on July 22, 2004.  Thus, the Council finds that the appellant was overpaid for any E/M services he may have billed for that date.  The Council further finds the appellant liable for the services, if any were provided.

(Id. at 00101 (citation and footnote omitted).)

Plaintiff argues that because CIGNA, Q², and the ALJ all reviewed the service without regard to the discrepancy in the date of service, the MAC should be estopped from denying this service and should be directed to review the service using the 1995 Guidelines.  (Pl.s' Mem., DE # 19, at 15; see also Compl., DE # 2, ¶ 84.)  The court disagrees.

First, it is doubtful estoppel can even be used against the MAC.  See Volvo Trucks of N. Am., Inc. v. United States, 367 F.3d 204, 211-12 (4th Cir. 2004) ("Equitable estoppel against the government is strongly disfavored, if not outright disallowed, because it allows parties to collect public funds in a situation not expressly authorized by Congress. . . .  If equitable estoppel ever

applies to prevent the government from enforcing its duly enacted laws, it would only apply in extremely rare circumstances." (citations omitted)).  Second, even assuming it can, plaintiff "must not only satisfy the traditional elements for equitable estoppel, but also [he] must show affirmative misconduct by [a government agent] that exceeds conduct the Court has already deemed acceptable."  Dawkins v. Witt, 318 F.3d 606, 611-12 (4th Cir.) (footnote omitted), cert. denied, 539 U.S. 960 (2003).  While the various reviewers prior to the MAC all noted the date of service as 22 July 2004 without any reference to the medical record reflecting 21 July 2004 as the actual date of service, (see AR at 01050, 01397, 01478), the court fails to see how this fact could constitute a misrepresentation let alone affirmative misconduct.  Finally, given that the MAC was obligated to conduct a *de novo* review and thus is not bound by any of the earlier decisions, see Almy, 2012 WL 1446029, at *12 ("The Secretary's promulgated regulations make clear that a decision by a contractor or ALJ is only binding on the parties to that particular case, and that a decision is not binding once 'a party files a written request for a MAC review that is accepted and processed.'" (citing 42 C.F.R. § 405.984)), plaintiff could not have reasonably relied on the "misrepresentation" of the 22 July 2004 date in those earlier decisions, see Volvo Trucks, 367 F.3d at 212 (recognizing that equitable estoppel requires reasonable reliance).  Plaintiff has failed to establish that equitable estoppel should be applied against the MAC and suggests no other basis for overturning its decision as to this date of service.

## D.    The MAC's Decision as to Beneficiary MT

According to plaintiff, he saw MT

> for an office visit and then dictated a progress note for that visit.
> The dictated note begins with "Note for [MT] on 6/10/2005."  The

SOAP format[9] was used to record the encounter. At the bottom
of the note is the typed name of the Plaintiff along with his
signature. A Medicare claim for the 6/10/2005 office visit was
subsequently filed and payment received.

(Compl., DE # 2, ¶ 87 (citation omitted).) As to this service, the MAC found:

> The record contains a typewritten document with the heading
> "Note for [Beneficiary M.T.] on 6/10/2005 - Chart 1966" The
> transcript reflects the following:
>> [the SOAP format]
> The record does not establish when the above document was
> created. While the appellant signed it, it is not dated.
> Accordingly, it cannot be ascertained whether the note was created
> contemporaneously with the office visit or at some other point in
> time. Therefore, the Council finds that the record contained
> insufficient documentation that the services at issue were provided
> on the date in question.

(AR at 00125-26 (citations omitted).) Further, in ruling on plaintiff's motion for reconsideration,

the MAC stated:

> . . . . It is imperative that documentation is provided to a reviewer
> which establishes when and if services were provided. Relevant to
> this end is the ability to determine when documentation was
> created. Documentation which is signed by a provider, but not
> dated, brings into question whether the documentation was
> compiled at some point removed in time from the actual date of
> service. If the reviewer/contractor is unable to definitively
> ascertain the contemporaneous nature of the documentation at
> issue, the services will be denied as non-covered. Medicare will
> not pay for services unless sufficient information is provided to
> determine the amounts due for such services. Social Security Act
> (Act), section 1833(e). Further, it is the provider's responsibility to
> provide such information/documentation. 42 C.F.R. § 424.5(a)(6).

(Id. at 00005.)

Plaintiff contends that the MAC's decision to deny this service is unwarranted by the

___

[9]"Medical reports are typically written in 'SOAP' format, an acronym for 'Subjective, Objective,
Assessment, and Plan.'" Boren v. Bocca, No. 3:08-cv-00174-LRH (VPC), 2010 WL 582563, at *4 n.4 (D. Nev.
Feb. 11, 2010) (citation omitted).

facts. (Compl., DE # 2, ¶ 92.) Specifically, plaintiff argues that there is no policy establishing the time frame for creation of a progress note nor any requirement that the provider's signature be accompanied by a date. (Pl.'s Mem., DE # 19, at 16.) According to plaintiff, he provided exactly what was required– the date of service and his legible identity as the service provider. (Id. (relying on 1995 Guidelines at 2; Medicare Program Integrity Manual, ch. 3, § 3.4.1.1(B), http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html).) In response, the government relies on a provision in the Medicare Claims Processing Manual which provides that "'[t]he service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record.'" (Def.'s Mem., DE # 24, at 23 (quoting Medicare Claims Processing Manual, ch. 12, § 30.6.1(A)[10]).) On this issue, the MAC's finding that the documentation of the service provided to MT is not dated is not supported by substantial evidence.

---

[10]The section which contains this provision is entitled "Use of CPT Codes" and reads in its entirety:
> Advise physicians to use CPT codes (level 1 of HCPCS) to code physician services, including evaluation and management services. Medicare will pay for E/M services for specific non-physician practitioners (i.e., nurse practitioner (NP), clinical nurse specialist (CNS) and certified nurse midwife (CNM)) whose Medicare benefit permits them to bill these services. A physician assistant (PA) may also provide a physician service, however, the physician collaboration and general supervision rules as well as all billing rules apply to all the above non-physician practitioners. The service provided must be medically necessary and the service must be within the scope of practice for a non-physician practitioner in the State in which he/she practices. Do not pay for CPT evaluation and management codes billed by physical therapists in independent practice or by occupational therapists in independent practice.
> Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record.

Medicare Claims Processing Manual, ch. 12, § 30.6.1(A).

As the MAC itself noted, the document's "heading" contains the date of "6/10/2005." The government does not contend that the date must immediately precede or follow the provider's signature line. Thus, the fact that the date is contained within what is characterized as the "heading" is of no moment; it is clearly part of the record documenting the provision of the service. Further, that a provider *should* document an E/M service during its provision or as soon as practicable thereafter is not an unequivocal requirement, see Baptist Healthcare Sys. v. Sebelius, 646 F. Supp. 2d 28, 35-36 (D.D.C. 2009) (concluding that in the context of a section of the Medicare Provider Reimbursement Manual, the words "must" and "should" are not synonymous), for which coverage for an E/M service may be denied. In sum, because the documentation is dated, plaintiff provided sufficient information for Medicare to determine the amount due, if any, for this service. The court will remand the claim for this service.

### E.    The MAC's Decision as to Beneficiary OW

Finally, the court feels obligated to address the service plaintiff provided to beneficiary OW on 13 October 2004. Unlike with beneficiaries WB and MT, plaintiff does not allege in the complaint a claim for relief regarding the E/M service he rendered to OW nor does plaintiff raise an argument addressing that service in his memorandum in support of his motion for summary judgment. However, in response to the government's cross-motion, he claims that the MAC's application of the 1997 Guidelines does not affect this court's analysis of the E/M services provided to WB, MT, *and OW*.    (See Pl.'s Resp., DE # 25, at 4 ("Refusing to use the 1995 [G]uidelines for the exam component affected 23 of the 26 disputed E/M services in this matter. The only unaffected beneficiaries are [WB, MT, and OW](10/13/04).").)    Later in his response, plaintiff analyzes the 13 October 2004 service provided to OW. (Id. at 13-17.) Plaintiff

contends that his documentation of the service supports the CPT code at which he billed

Medicare, 99222. (Id. at 16-17.)

In analyzing this service, the ALJ stated:

> There are three key components required to establish the level of
> care for CPT code 99222: a comprehensive history[;] a
> comprehensive examination; and medical decision making of
> moderate complexity. There is no dispute that the appellant
> satisf[ies] the first two prongs. Medical records document the
> extensive medical history and numerous tests that were done for
> the beneficiary. With regards to the third prong the documentation
> does not show: that a number of possible diagnoses and/or a
> number of management options were considered; that a moderate
> amount of medical records, diagnosis test, had to be obtained,
> reviewed and analyzed and that there was a risk of complication.
> Hence the evidence does not prove that a medical decision making
> of moderate [complexity] was performed in this case. Therefore it
> is the decision of the undersigned that the appellant has not
> provided sufficient evidence to meet its burden of proof that the
> services billed as CPT code 99222 was [sic] performed. The
> documentation however is sufficient to meet the burden of CPT
> code 99221.

(AR at 01083.) Accordingly, the ALJ concluded that "[t]he initial hospital services provided by

the [plaintiff] on October 13, 2004, billed as CPT code 99222 should be paid at the downcoded

CPT code 99221." (Id. at 01084.) The MAC affirmed the ALJ's decision. (Id. at 00128.)

The only element of the medical decision making component that the parties dispute is

the number of diagnoses or management options. As both the ALJ and the MAC recognized,

CPT code 99222 requires medical decision making of moderate complexity. (Id. at 00128,

01083.) In turn, medical decision making of moderate complexity requires that "multiple"

diagnoses or management options be considered. 1997 Guidelines at 43; 1995 Guidelines at 11;

Evaluation and Management Services Guide at 16. While the Guidelines do not explicitly define

"multiple," they do offer some guidance as to how one assesses the number of diagnoses or

management options considered on a scale of "minimal" to "extensive," with "multiple" being just below "extensive."

> The number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis and the management decisions that are made by the physician. Generally, decision making with respect to a diagnosed problem is easier than that for an identified but undiagnosed problem. The number and type of diagnostic tests employed may be an indicator of the number of possible diagnoses. Problems which are improving or resolving are less complex than those which are worsening or failing to change as expected. The need to seek advice from others is another indicator of complexity of diagnostic or management problems.

1997 Guidelines at 44; 1995 Guidelines at 11-12; see also Evaluation and Management Services Guide at 16-17.  While it is apparent that a number of tests were ordered of OW and that her condition was worsening, at least upon initial hospital admission, OW was an established patient of plaintiff, with a past history of chronic renal failure, hypertension, osteoarthritis, chronic leg edema, volume overload, and pan colonic diverticulosis.  (See AR at 00657, 00684.)  She was admitted to the hospital because of chronic renal failure, fatigue, and leg swelling.  (Id. at 00684.)  With the exception of fatigue, these problems were established and overall required less in the way of decision making.  Thus, the court agrees that substantial evidence supports the ALJ's decision (which the MAC affirmed) that plaintiff did not have to consider a number of possible diagnoses and/or a number of management options on this date of service.  The court affirms the MAC's decision to downcode the service.

## IV.  CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is ALLOWED IN

PART and DENIED IN PART. The government's motion is ALLOWED IN PART and DENIED IN PART. Plaintiff's claim for the 10 June 2005 service provided to MT is REMANDED to the Secretary for further consideration in accordance with this order. The court affirms the Secretary's decision in all other respects.

This 29 May 2012.

W. Earl Britt
Senior U.S. District Judge